BLAIR et al. v. JEFFERSON & N. W. RY. CO. (No. 2144.)

(Court of Civil Appeals of Texas. Texarkana. June 19, 1919. Rehearing Denied June 26, 1919.)

1. MASTER AND SERVANT ⊕⇒301(1) — MILL OWNER NOT SOLELY RESPONSIBLE FOR NEGLIGENCE OF RAILROAD'S SERVANTS MOVING CARS.

The act of defendant railway company's trainmen in moving cars on a mill track to places designated by an oil company served by such track was for the mutual benefit of the railway company and the oil company, not for the sole benefit of the latter, so as to render the trainmen while so engaged its servants, for whose negligence it would be solely responsible.

2. RAILROADS ⊕⇒282(9)—TRAINMEN NOT ENTITLED TO OMIT WARNINGS TO OTHERS WORKING NEAR TRACK.

Trainmen, shunting cars on an oil company's spur track, were not as matter of law entitled to assume that the oil company would warn its employés working beside the track of any danger from shunted cars.

3. RAILROADS ⊕⇒282(5) — EVIDENCE SUFFICIENT TO SHOW DUTY TO WARN PERSON WORKING NEAR TRACK.

In an action against a railway for death of an oil company's employé, working beside a spur track, evidence *held* sufficient to support finding that the trainmen owed the oil company's employé the duty to warn him before shunting a car toward him.

Appeal from District Court, Marion County; J. A. Ward, Judge.

Action by Mrs. E. V. Blair and others against the Jefferson & Northwestern Railway Company. From a judgment for defendant, plaintiffs appeal. Reversed, and cause remanded.

There was testimony which would have warranted a jury in finding as follows: The Jefferson Oil Company's mill and seed house was on the north side of and adjacent to a spur track maintained by appellee for said oil company's use. A conveyor used to carry cotton seed unloaded from cars on the spur

or mill track to the seed house was situated about 170 yards west of the point where the mill track intersected appellee's main line track. Scales used for weighing cars were situated on the spur track 100 to 150 feet west of the seed conveyer. During November, 1917, cars loaded at the oil company's mill and cars which had been unloaded there were daily moved by appellee's trainmen to its main line track, and cars to be loaded at the mill and also cars to be unloaded there were carried by said trainmen to and "spotted" on the mill track. The practice was for the trainmen to weight the cars to be moved from the mill track before moving same to the main line track, and, after said cars were so moved, to "shunt" from the main line track to mill track the cars to be spotted on the latter, in the order in which they were to be placed. The "spotting" of the cars after they were shunted on to the mill track was done by using the locomotive to move them to places designated by the oil company. In unloading seed from cars to the conveyer some of the seed always fell to the ground on the mill track. It was the practice of the oil company, after the cars to be carried to the main line track had been moved off of the spur track, to have its employés pick up the seed which had fallen to the ground. In accordance with this practice, B. J. Blair, an employé of the oil company, assisted by its superintendent, on November 12, 1917, was engaged in picking up seed which had so fallen, when appellee's trainmen, having weighed and moved the cars on the mill track off of same, began to shunt cars onto same, preparatory to spotting them thereon. They first shunted an empty car to a point near the place where Blair and the superintendent were at work. A brakeman named Lockett was on this car, and stopped it at the point specified. Blair and the superintendent, who, it seems, had ceased to pick up seed and gotten off the track as the car approached, at once, when the car stopped, returned to the work they had been engaged in; Blair taking a position on the mill track five or six feet west of said car, and the superintendent a position ten to twenty feet still farther west. A few minutes later the trainmen shunted a loaded car onto the mill track, which struck the other car with such force as to cause it to suddenly move west, knocking Blair down and running over him, and thereby so injuring him as to cause him to die.

The cars were handled on this occasion in about the same way they had before been handled. Appellee's said trainmen on other occasions had seen employés of the oil mill at work picking up seed, as Blair and the superintendent were on this occasion. There was nothing to prevent the brakeman, Lockett, from seeing Blair and the superintendent while he was on the empty car; and Peterson, another one of the trainmen, after Lockett stopped and set the empty car, was in a position to see the track "all the way down to the hull house," which was beyond the point on the track where Blair and the superintendent were at work. At the time he was injured as stated, Blair had been working for the oil company only a few days, and, it seems, had never before engaged in the work he was then doing, and, so far as the record shows to the contrary, knew nothing about the practice of the trainmen in shunting cars onto the mill track. Working as he was on the west side of the empty car, Blair could not see the loaded car after it was shunted from the main line to the mill track.

The suit was by appellants (Blair's widow and children), on the theory that appellee's trainmen, in shunting the loaded car onto the mill track, as they did, without warning Blair, were guilty of negligence which rendered appellee liable to them.

The appeal is from a judgment in appellee's favor on a verdict returned in conformity to a charge by the trial court as follows:

"In this case the undisputed evidence shows that the defendant's servants and employés went onto the side track or spur where deceased, B. J. Blair, was injured, for the purpose of removing and placing cars for the sole use and benefit of the Jefferson Oil Company, and gave notice to the superintendent of the said oil company of the presence and intentions of the said servants and employés of defendant, and received from him instructions as to what said superintendent desired should be done by them. Having notified the superintendent of the oil mill of their presence and purposes, and having received instructions from him as to what he desired they should do with reference to moving and switching cars on the industrial track for said oil mill, the defendant's employés had the right to assume that the said spur track was open for their use, and that the said oil mill superintendent would keep the employés out of danger, and the servants of defendant railway company under the law were not required to keep a lookout to ascertain whether any persons were in danger or in peril on said spur track, while defendant's servants were thus switching cars on said spur track. It therefore follows that defendant or its servants have not violated any duty to the said B. J. Blair, and were guilty of no negligence that could be the proximate cause of his death, and plaintiffs are not entitled to recover. You are therefore instructed to find for the defendant."

S. P. Jones, of Marshall, and T. D. Rowell, of Jefferson, for appellants.

Schluter & Singleton, of Jefferson, and King & Estes, of Texarkana, for appellee.

WILLSON, C. J. (after stating the facts as above). [1] As the cause is to be remanded to the court below for a new trial, we will not comment on the testimony much further than to say that, had the jury found the facts to be in harmony with the statement above, we think they would have had a right to infer therefrom that the trainmen were,

and that Blair, the deceased, was not, guilty of negligence on the occasion in question. If the jury would have had such a right, then, of course, the trial court erred when he instructed them as he did, unless it appeared as a matter of law that when the trainmen began to move cars on the spur track they ceased to be employés of appellee, and became instead, and while doing work on that track continued to be, employés of the oil company. If it had appeared from "undisputed evidence," as statements in the charge indicated the trial court thought it did, that in moving the cars the trainmen acted "for the sole use and benefit" of the oil company and in accordance with its instructions, it might not have been error had the court treated the trainmen as employés for the time being of the oil company, for whose conduct appellee was not responsible. But it did not so appear. On the contrary, it reasonably appeared that, while the oil company instructed the trainmen where to "spot" the cars to be placed on the spur track, it gave them no instructions whatever as to how the spotting should be done; and the movement of the cars was on appellee's own track, and, obviously, we think for the mutual benefit of appellee and the oil company, and not for the sole benefit of the latter company.

[2, 3] Notwithstanding the statements in the charge referred to, however, we gather from other statements therein that the trial court did not instruct the jury as he did because he thought it appeared that the trainmen were for the time being employés of the oil company, but because he thought they had a right to assume that the oil company would give such warning to its employés engaged in working on or about the spur track as would cause them to take all steps necessary to avoid injury to themselves by cars to be moved thereon. We do not agree that the trainmen had such a right as a matter of law. If the jury might have found, and we think they might, that the trainmen owed Blair the duty to discover and warn him they were going to do so, before they shunted the loaded car onto the spur track, certainly it should not be said that appellee was entitled as a matter of law to be excused from the consequences of a failure on their part to discharge the duty, merely because they expect-

ed the oil company to warn him. That the jury might have found that the trainmen owed Blair such a duty we think is reasonably clear. He was not a mere trespasser on appellee's track. One of the trainmen testified, in effect, that he knew it was the practice of the oil company to have its employés go on the track and pick up seed which had fallen thereon. We are not prepared to say that that testimony alone would not have supported a finding that appellee owed Blair a duty. But there was other testimony which tended, and perhaps more strongly, to show the existence of a duty on the part of the trainmen to Blair. From that testimony the jury had a right to say that the brakeman, Lockett, saw Blair and the superintendent get off the track as the empty car first shunted onto the track approached them, and saw them return to their work thereon after he stopped and set the car, and to say that the conductor, Peterson, was in a position where he could have seen, and (notwithstanding his statement to the contrary) that he did see, Blair and the superintendent at work on the track after the empty car was shunted to and stopped thereon, and before the loaded car was shunted against it. It cannot be doubted, we think, that if the trainmen knew that employés of the oil company were at work on the track, they owed such employés a duty to warn them before shunting the loaded car against the empty one as they did.

As we understand them, both McInerney v. Canal Co., 151 N. Y. 411, 45 N. E. 848, and Campbell v. Railway Co., 92 Conn. 322, 102 Atl. 597, cited by appellee, are distinguishable from this case. The decision in the McInerney Case seems to have been predicated mainly on the conclusion the court reached that the men in charge of the switch engine were for the time being servants of the lumber company instead of the canal company; and in both that case and the Campbell Case there was no evidence tending to show that the switching crew knew that the plaintiff was in a position to be injured by the movement of the cars they were handling.

The judgment will be reversed, and the cause will be remanded for a new trial.